Bernhard R. KURIO, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 66–H–509.

United States District Court,
S. D. Texas,
Houston Division.

June 15, 1970.

Amended Memorandum Dec. 11, 1970.

Robert I. White, of Chamberlain & Hrdlicka, Houston, Tex., for plaintiff.

Leonard B. Tatar, Atty., Tax Div., Dept. of Justice, Houston, Tex., for defendant.

NOEL, District Judge.

MEMORANDUM OPINION:

This case began as a suit for refund of payroll taxes. Over $89,000 in such taxes for 1963 and 1964 were assessed. Plaintiff paid a portion and sued for refund. The Government filed liens and counterclaimed for the balance.

On the day set for trial, the case became more than a refund suit. When called, Government counsel announced that the parties had agreed to settle the case, and requested leave to amend the Government's answer and counterclaim to so allege. The motion was unopposed and granted. The Government then moved for judgment on an asserted contract of settlement. Plaintiff admitted negotiations for settlement were had, but denied that a contract of settlement had been achieved. The Government's motion was carried with the case.

Trial was had, on both the refund and contract issues. After considering the record carefully, the Court determined that plaintiff should recover on his claim for refund. The Court also determined that the Government's motion to enforce the claimed contract probably should be denied but that the administration of justice would be best served by a severance of the refund issue from the contract issue. The latter conclusion was reached primarily because preparation of findings of fact and conclusions of law on the contract issue would require a tedious and lengthy examination of the procedure for processing tax returns, and the felt probability that after an adverse determination of the refund issue, the Department of Justice would review the record, perceive the weakness of its contract claim, and recede from the latter out of court.

The merits of the refund claim were fully examined in a Memorandum and Order constituting findings of fact and conclusions of law with respect to all issues other than the contract issue, D.C., 281 F.Supp. 252 (1968). A final judgment was entered as to such issues pursuant to Rule 54(b), Fed.R.Civ.P., in which plaintiff's claim for refund was granted and the Government's counterclaim dismissed insofar as it was based on the assessments for 1963 and 1964. No appeal was taken and such judgment became final. This transformed the posture of the pleadings left in the case from a suit by plaintiff for a tax refund, to a suit by the Government on an asserted contract.

Soon after the judgment became final, it became apparent that the Government would not dismiss but continue to press its claim of contract and seek recovery of the amount which it claimed plaintiff had agreed to pay in settlement. The settlement issue remained on the docket. The tax liens outstanding against plaintiff were

not released or reduced, notwithstanding the Court had determined in its Memorandum and Order that plaintiff was not liable for any 1963 or 1964 tax and that the liens based on the assessments for those years were null and void. Though judgment on the tax aspect of the case had become final, the lien records in Harris County, Texas, continued to reflect that plaintiff owed the Government over $89,000 in 1963 and 1964 taxes.

Although requested by plaintiff to do so, the Government refused to release or reduce its liens until plaintiff paid the full amount claimed under the settlement. Eventually, to obtain release of the liens, plaintiff found it expedient to pay such amount. He then amended his pleadings and now sues for refund a second time, seeking to recover all that he has paid the Government, both in taxes and in satisfaction of the alleged contract. The Government has not responded to plaintiff's amended complaint, but its prior pleadings manifest its position that it is entitled to all sums plaintiff has paid. The Government's trial amendment which added the Government's claim of settlement had engrafted a cluster of new issues on the original refund suit.

As the evidence developed at trial, it became clear that the parties' attempts to settle were frustrated by processing errors in the automatic data processing system of the Internal Revenue Service (IRS) which released ripples and waves of governmental action and inaction, human and mechanical. These errors ultimately caused a misapplication of payments made by plaintiff. The system was incapable of promptly finding and correcting its errors. When the mistakes were finally discovered, the Government failed promptly to admit them. The resulting snarl is now before the Court for resolution.

As anticipated, the Court has concluded that no contract of settlement resulted from the negotiations between plaintiff's and Government counsel. Why this is so— why the words which passed between counsel failed to create a contract—while apparent from the testimony, is best understood from an application of the law of contracts to the pertinent events surrounding the negotiations and ultimate discovery by the Government of its mistake.

■ Agreements comprising tax litigation are, of course, contracts. As such they are subject to the rules applicable to contracts generally, *United States v. Lane*, 303 F.2d 1, 4 (5th Cir. 1962), unless tax policy requires some other result, as it did for example in *United States v. Feinberg*, 372 F.2d 352 (3d Cir. 1965), aff'd on rehearing en banc, 372 F.2d 352, 359 (1967). Before applying any of the general contract rules pertinent here, the Court in each instance has determined whether that rule is consistent with tax policy. All conflicts and potential conflicts are raised and considered herein.

■ Under general contract law, in considering whether a contract has been formed a court must place itself as nearly as possible in the position of the parties at the time of their negotiations, a process which requires analysis of all pertinent events. *Local 787, IUE v. Collins Radio Co.*, 317 F.2d 214, 220 (5th Cir. 1963). *See generally*, 3 A. Corbin, *Contracts* §§ 538, 543A–B (1960 ed. & Supp.1964) [hereinafter cited as 3 Corbin]. Accordingly, the bulk of this memorandum opinion consists of a detailed statement and analysis of the complex facts.

## I. BACKGROUND

The withholding tax provisions of the Internal Revenue Code of 1954 (hereinafter called "the Code") and the Federal Insurance Contributions Act (FICA) require every employer to deduct and withhold taxes upon the wages he pays his employees. 26 U.S.C. §§ 3101–02, 3402. Additionally, the FICA and the Federal Unemployment Tax Act (FUTA) impose taxes upon employers computed as a percentage of wages. 26 U.S.C. §§ 3111, 3301. By regulation, employers liable for withholding and FICA taxes are required to return such taxes quarterly on a prescribed form (hereinafter sometimes called a "941 return"). Treas.

Reg. §§ 31.6011(a)–1, –4. FUTA taxes are required to be returned annually on a Form 940. Treas.Reg. § 31.6011(a)–3. Employers who fail without reasonable cause to file such returns are subject to penalty. 26 U.S.C. § 6651.

If an employer's liability for withholding and FICA taxes exceeds $100 for either of the first two months of a calendar quarter, he is required to deposit the tax for that month in a Federal Reserve Bank or authorized commercial bank. Treas.Reg. § 31.-6302(c)–1; see 26 U.S.C. § 6302. During the period relevant here, he then could elect whether to deposit the remainder of his quarterly tax liability in the manner provided for monthly payments, or to enclose payment with his return.[1] A penalty is prescribed for failure without reasonable cause to make required deposits. 26 U.S.C. § 6656.

An employer required to make deposits for a taxable period in 1967 or earlier was also required to prepare a Federal Depositary Receipt for each deposit for validation by a Federal Reserve Bank. The validated depositary receipts and the remittance of any balance due were then attached to the 941 return for the period with respect to which the deposits were made. Treas.Reg. § 31.6302(c)–1(a)(3)(ii). The 941 return provided space not only for a summary computation of the employer's tax liability (the total taxable wages paid during the quarter, the amount of income tax withheld, the total FICA taxes due, the total of the enclosed depositary receipts, and the balance due), *but also for identification of the depositary receipts by serial number, date, and amount. The depositary receipts thus served to substantiate the amount of tax deposited by the employer, entitling him to a credit on his 941 return for the quarter.*[2]

An employer submitting a 941 return is required to substantiate the total wages he reports as subject to FICA tax by itemizing the taxable wages paid each employee during the quarter. Such amounts are entered in a schedule provided on the return and on continuation sheets furnished by the IRS for that purpose. Similar sheets are available from the IRS to correct wage information supplied for previous quarters. By completing such sheets and attaching an adjustment computation, an employer can correct a tax liability previously reported.

As a contractor in the construction industry during 1963, 1964, and 1965, plaintiff subcontracted drywall construction from house and apartment builders. During 1963 and 1964, plaintiff would bid on projects and if his bid was accepted, would arrange with others to perform the services necessary to carry out the jobs. He did not consider the persons with whom he contracted to do the work to be his employees. Rather, he treated them as self-employed independent contractors, and did not withhold any taxes from the amounts he paid them. He filed no 940 or 941 returns, and paid no withholding, FICA, or FUTA taxes.

Since January 1965, plaintiff has employed workers on an hourly basis to do the work required by his contracts with builders. Since then he has withheld payroll taxes. He has filed returns regularly and remitted withholding, FUTA, and FICA taxes to the Government.

During the fourth quarter of 1965, acting pursuant to a policy decision within the IRS to make a test case on a drywall contractor, an agent from the Houston IRS office reviewed plaintiff's books. The agent's report to his superiors contained three findings pertinent to plaintiff's liability for payroll taxes: a determination that plaintiff's payments for the services required by his drywall subcontracts in 1963 and 1964 were "wages" paid "employees"; a computation

---

1. Since the first quarter of 1968, employers whose quarterly liability exceeds the amount deposited by more than $100 have been required to deposit the amount due. Treas.Reg. § 31.6302(c)–1(a)(1)(iv).

2. Since 1967 the IRS has obtained substantiation of deposits by magnetic tape from the Federal Reserve Banks. Employers no longer are required to obtain validated depositary receipts and attach them to their 941 returns. Treas.Reg. § 31.6302(c)–1(a)(3)(iii).

of the withholding, FUTA, and FICA taxes based on such payments; and, a determination that because plaintiff had failed without reasonable cause to file returns or make monthly deposits, plaintiff was liable for additions to such taxes and for penalties in certain amounts.

In a letter dated December 29, 1965, the District Director advised plaintiff of the taxes and penalties claimed to be due, proposed adjustments to plaintiff's tax liability for the appropriate periods, and informed plaintiff of his right to administrative review within the IRS. A copy of the agent's report was enclosed. Plaintiff protested the agent's findings and requested a hearing, which was held before the Appellate Division of the Regional Commissioner's Office at Houston on March 15, 1966. Plaintiff offered evidence and argument of counsel, but the protest was denied.

Thereafter, in June and July of 1966, the proposed taxes were assessed against plaintiff. An "assessment" is a technical procedure required by § 6201 of the Code. At trial, both plaintiff and Government counsel acted under the assumption that the requisite procedure was followed, and plaintiff offered evidence that assessments were in fact made.

The assessment caused liabilities for payroll taxes to be recorded in the IRS computer's memory bank in the summer of 1966, and thereby created deficiencies and apparent delinquencies in plaintiff's accounts for all four quarters in and for each of the years 1963 and 1964. These accounts were assigned to a revenue officer in the Houston office of the Delinquent Accounts and Returns Branch of the Collection Division of the Office of the District Director. Officers in that branch are commonly referred to as collection officers and are responsible for filing notices of tax liens, serving levies, seizing and selling real and personal property, and recommending "civil actions to secure payment, suits to enforce penalty for failure to honor levies, and penalty assessments as a means of collection or as a method of obtaining compliance with existing laws and regulations." 35 Fed.Reg.

2417, 2453 (1970) (§ 1118.524 of a statement on IRS organization and functions, a prior version of which is printed in 9 J. Mertens, Federal Income Taxation § 49.75, at 119 (1965 rev.) [hereinafter cited as 9 Mertens]).

Mrs. Maida R. Jennings, the collection officer in the Houston office who had been assigned plaintiff's apparently delinquent accounts, contacted plaintiff's counsel during the summer of 1966 to inform him that she proposed to commence the seizure of assets and other collection procedures. Counsel promptly contacted plaintiff and his accountant, who prepared and filed claims for abatement of the assessed taxes. Thereafter, plaintiff's counsel persuaded Mrs. Jennings and her superior to suspend all collection efforts except the filing of tax liens, pending resolution of the claims for abatement. A notice of lien for the full amount of the unpaid assessment was prepared by Mrs. Jennings and caused to be filed in the Federal Lien Records in Harris County, Texas, on August 8, 1966.

Plaintiff's claims for abatement were supported by a number of statements given by persons alleged to have been his employees in 1963 and 1964. By statute, 26 U.S.C. § 3402(d), and regulation, Treas.Reg. §§ 31.-3402(d)–1, .3403–1, an employer may obtain credit against his liability for withholding taxes by proving that his employees have paid their income taxes. The IRS has promulgated a Form 727 to assist employers in making such proof. An employee completing the form declares "under the penalties of perjury" that he filed an income tax return, reported the wages received from the employer as income, did not report any amount of tax as withheld by that employer, and paid his tax.

Plaintiff testified at trial that he and his wife obtained the Forms 727 over a period of months by working late in the evenings and on weekends. Many of the alleged employees had moved out of state and were difficult to locate. Even so, plaintiff and his wife had succeeded in obtaining a number of the statements prior to the hearing before the Appellate Division in March 1966, and obtained others later. The state-

**49**

ments obtained prior to the appellate hearing were offered in evidence by plaintiff's counsel, but failed to persuade the Appellate Division that the proposed assessment was excessive.

After suit was filed, plaintiff, through his accountant and counsel, asked the Government to furnish the 1963 and 1964 income tax returns of all persons alleged to have been his employees during those years. After the Government failed to furnish all such returns voluntarily, plaintiff's counsel sought them through discovery procedures, serving Government counsel with requests for admissions and interrogatories, and serving a subpoena duces tecum on an IRS agent who would be a witness at trial. The Government neither opposed nor complied with plaintiff's repeated attempts to discover the missing income tax returns, but simply ignored plaintiff's repeated demands. It would appear that plaintiff proceeded to trial without seeking sanctions from the Court to compel such discovery, and its attendant delay, because of the eco-nomic compulsion created by what this Court determined to be invalid tax assessments and liens. But in the manner now to be described, the Government's failure to discover such returns substantially increased plaintiff's burden of preparing his case for trial and making proof.

A taxpayer suing for a refund has the burden of proving his claim against the Government because he is plaintiff. In this regard, such a suit is akin to a suit against a private defendant for money had and received. *Zeeman v. United States*, 395 F.2d 861, 865 (2d Cir. 1968); *Ehlers v. Vinal*, 382 F.2d 58, 65–66 (8th Cir. 1967); *Larchfield Corp. v. United States*, 373 F.2d 159, 164 (2d Cir. 1966); *Gibson v. United States*, 360 F.2d 457 (5th Cir. 1966); *Young & Rubicam, Inc. v. United States*, 410 F.2d 1233, 187 Ct.Cl. 635 (1969). By virtue of the penultimate sentence of § 7422(e) of the Code, the taxpayer has an identical burden with respect to issues raised by a Government counterclaim. *See Zeeman v. United States, supra,* at 866.[3]

---

**3.** Often the rule placing the burden of proof on the taxpayer is loosely referred to as a presumption that the taxes assessed against the taxpayer were legally assessed. E. g., *Greer v. United States*, 408 F.2d 631, 633 (6th Cir. 1969); *Bar L. Ranch, Inc. v. Phinney*, 300 F.Supp. 839 (S.D.Tex.1969); cases cited *Timken Roller Bearing Co. v. United States*, 38 F.R.D. 57, 61–62 (N.D.Ohio 1964). However, such is not a presumption of the kind considered by the Supreme Court in *Leary v. United States*, 395 U.S. 6, 32–36, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), and the cases there discussed; and were it in fact subject to the rules explicated in *Leary* as applicable to statutory presumptions generally, it might well be invalid, for cases like this one and *Pizzarello v. United States*, 408 F.2d 579 (2d Cir. 1969), suggest that there may be no rational connection between the facts proved (i. e., that taxes were assessed) and the fact presumed (i. e., that the assessment was proper). Rather than a presumption, this procedural rule is a mere allocation of the burden of proof. Some courts have held that it allocates only the burden of production, saying it "is not evidence itself and disappears upon the introduction of evidence to overcome it." *Pizzarello v. United States*, supra, at 583, and cases cited; *Timken Roller Bearing Co. v. United States*, supra, at 62; cf. Rule 32, Rules of Procedure Before the Tax Court of the United States, promulgated under § 7453 of the Code (authorizing the pre-scription of "rules of practice and procedure other than rules of evidence)"); *Barnes v. Commissioner*, 408 F.2d 65 (7th Cir. 1969).

The treatment of the rule under discussion as more than an allocation of the burden of proof has been decried as a cause of injustice. *Fulton Container Co. v. United States*, 355 F.2d 319, 324–25 (9th Cir. 1966); *David v. Phinney*, 350 F.2d 371, 377 (5th Cir. 1965) (Brown, J., dissenting), cert. denied, 382 U.S. 983, 86 S.Ct. 560, 15 L.Ed.2d 473 (1966); cf. *Barnes v. Commissioner*, supra, at 70 (dissent); *F. & D. Rentals, Inc. v. Commissioner*, 365 F.2d 34, 41 (7th Cir. 1966) (dissent). Certainly the loose terminology rampant in the cases risks confusing the burdens of production and persuasion and the rules of evidence. Shifting burdens and disappearing presumptions mislead. The rule applicable here places the burden of persuasion (and the initial burden of production) on the plaintiff in a refund suit with respect to all issues raised by his complaint and by the Government's counterclaim. It has no effect on the rules of evidence nor on the burdens of production and persuasion with respect to affirmative defenses pleaded by the Government. Cf. Rule 32, Rules of Procedure Before the Tax Court of the United States ("in respect of any new matter pleaded in his answer, it [the burden of proof] shall be upon the respondent"); *James M. Pierce Corp. v. Commissioner*, 326 F.2d 67 (8th Cir.

At trial Government counsel was well aware of plaintiff's burden on the refund issue. Indeed, relying only on the rule giving plaintiff the burden, counsel elected not to present any evidence on the refund issue, nor to cross-examine the witnesses called by plaintiff or answer plaintiff's counsel in oral argument. Only on the contract issue did Government counsel offer any evidence (the documents which the Government contends establish the contract of settlement), cross-examine plaintiff's witnesses, or offer oral argument. Counsel for the Government had the right to pursue this strategy, but not to the extent that he would violate this Court's order with respect to discovery and pretrial preparation, which provided in part as follows:

> Each attorney who attends [the pretrial conference] will familiarize himself with the pre-trial rules and practices of this Court and will be prepared to accomplish the purposes of Federal Rule of Civil Procedure 16; ie, simplifying the issues; expediting the trial; and avoiding unnecessary expenditure of time and money to the litigants.

■ "The Government as a litigant is, of course, subject to the rules of discovery." *United States v. Proctor & Gamble Co.,* 356 U.S. 677, 681, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958); *Campbell v. Eastland,* 307 F.2d 478, 485 (5th Cir. 1962), cert. denied, 371 U.S. 955, 83 S.Ct. 502, 9 L.Ed.2d 502 (1963). The Government therefore had no right to ignore plaintiff's discovery demands. Moreover, as representatives of the Government, all personnel connected with the litigation, including counsel, had an obligation "to be frank and fair and disclose all the

facts." *Campbell v. Eastland, supra,* at 485; *accord, United States v. San Antonio Portland Cement Co.,* 33 F.R.D. 513 (W.D. Tex.1963).

The Government's failure to furnish the returns in response to plaintiff's request and this Court's pretrial procedures had an immediate practical effect on the trial. As already indicated, income tax paid by employees may be offset against an employer's assessed liability for withholding tax and thus entitle him to an abatement of the withholding tax assessment. Moreover, plaintiff established at trial, through the testimony of Government personnel, that self-employment tax paid by alleged employees may be offset against one-half of the alleged employer's assessed liability for FICA taxes.[4] Thus by establishing that the persons alleged to have been his employees had declared and paid income and self-employment tax, plaintiff could have satisfied his burden of showing the assessment against him to be excessive.

■ The returns sought by plaintiff from the Government were material and relevant because they were the best evidence of the facts on which this issue turned. They were immediately accessible to all participating IRS and Justice Department personnel, any of whom could have determined their location by computer search in the regional Service Center or the National Computer Center and obtained them by oral request. See Treas.Reg. §§ 301.6103(a)– 1(e), –1(h). They were sought by plaintiff through duly ordered, established, and well understood discovery procedures. Nevertheless, they were not furnished and this increased plaintiff's burden of proving his

---

1964); *Commissioner v. Fleming,* 155 F.2d 204 (5th Cir. 1946).

4. The Government refused to abate the other half of the FICA assessment on the ground that it was a tax on the employer rather than a tax to be withheld from the wages paid employees. Plaintiff thus would not be entitled to an abatement of the remainder of the FICA assessment or of any of the FUTA assessment unless he proved that he had not been an "employer." *See* 26 U.S.C. §§ 3111, 3301.

The offset against the assessed liability was not dollar for dollar. If the alleged employee

filed an income tax return, reported the amounts received from plaintiff as income, and paid the tax shown due on his return, the Government abated the entire withholding tax assessment attributable to wages paid that employee. Similarly, if the alleged employee reported the amounts received from plaintiff as self-employment income and paid the self-employment tax shown due on his return, the Government abated one-half of the FICA assessment attributable to wages paid that employee.

case beyond that contemplated by the Congress and the courts. In effect, plaintiff was deprived the opportunity of satisfying his burden of proof on an important part of his case.

Although many of the returns sought by plaintiff were not furnished by the Government, many others were. An examination of the latter by plaintiff's accountant and the IRS agent whose investigation had led to the refund suit culminated in a stipulation between the parties filed April 24, 1967, which reduced plaintiff's maximum potential liability for the 1963 and 1964 taxes assessed against him to $25,629.48. The Government abated the remainder of the assessed taxes because the returns examined indicated that many of the alleged employees had reported and paid the corresponding income and self-employment tax. Plaintiff's accountant testified at trial that had the Government produced the returns corresponding to all the statements under oath which had been obtained by plaintiff, the assessment against plaintiff would have been further reduced by more than $6,000 in withholding taxes, leaving less than $20,-000 in dispute. And the record permits the clear inference that had all the returns requested been produced, both the withholding and FICA assessments against plaintiff would have been abated several thousand dollars more.

At trial plaintiff's counsel Mr. White testified that after the stipulation was entered into, he reviewed the evidence then available and reached the conclusion that he would recommend to plaintiff that the case be disposed of by compromise or settlement with an offer to pay the Government between $3,000 and $5,000, taking into account primarily the amount it would cost to try the case.

In late July or early August of 1967, White was informed by the collection officer Mrs. Jennings that on June 2, 1967, plaintiff had received a credit of $8,159.42 to his 1963-1964 tax liability. The credit had been computed as follows:

| Date of Credit | Amount |
|---|---|
| April 13, 1966 | $ 25.92 |
| February 7, 1966 | 506.77 |
| December 22, 1965 | 4,049.45 |
| November 22, 1965 | $3,386.27 |
| June 2, 1967 | 13.88 |
| June 2, 1967 | 177.13 |
| June 2, 1967 | $8,159.42 |

Mrs. Jennings told White *that she did not know the source of the payments or credits. At trial she testified she did not know their source* because she was handling only the 1963 and 1964 accounts, and the credits were produced from other years. At that time plaintiff had not been informed that the IRS considered anything amiss in his account for the fourth quarter of 1965, the period—according to date of credit—in which the bulk of the transferred credit was received by the Government. Nor had his account for that quarter been assigned to any revenue officer for collection.

However, *something was amiss* in plaintiff's account for the fourth quarter of 1965. A 941 return filed by plaintiff for that quarter had not been processed. This fact was not known to plaintiff, to Mrs. Jennings, or to the IRS computer memory bank, no entry in which reflected the filing of the return.

Here, at the first reference to the IRS computer, some precision in terminology is desirable. Technically, a computer is a machine. In the dictionary it is defined as "an automatic electronic machine for performing simple and complex calculations." Merriam-Webster New International Dictionary 468 (3d ed. 1961). On the other hand, an automatic data processing system as employed by the IRS includes people as well as machines of various types, including computers. In common parlance "the computer" is often used in a loose or generic sense to embrace the people involved in the automatic data processing system as well as the machines, and it was so used by witnesses from the IRS. However, the term will be used here in its restricted sense of a machine only, unless otherwise indicated.

The ramifications of the processing errors which prevented processing of the return eventually kept the prospective settlement of the refund suit from reaching fruition.

For this reason, although it substantially lengthens this opinion, their source and causes will be traced.

During the fourth quarter of 1965 and for some prior quarters, plaintiff did business under two trade names, "B. R. Kurio Sheetrock Contractor" (hereinafter called "Sheetrock") and "Drywall Specialties and Supplies" (hereinafter called "Drywall"). Most of plaintiff's employees were not members of a trade union. Such employees were designated and paid as employees of Sheetrock. On the occasions when union workers were employed, they were designated and paid as employees of Drywall. Plaintiff's only purpose for the separate designation and payment of employees was for internal control, namely to distinguish between wages paid union and non-union employees. He filed separate 941 returns showing taxes due by him under each trade name.

During the fourth quarter of 1965 plaintiff made no deposits under the Drywall trade name,[5] but did make two deposits in an authorized depositary under the Sheetrock trade name: $3,918.38 on November 22, 1965, for the month of October, and $4,049.45 on December 22, 1965, for the month of November, a total of $7,967.83. Plaintiff obtained a validated Federal Depositary Receipt for each deposit.

Early in 1966 plaintiff caused two 941 returns to be prepared for the quarter ending December 31, 1965. Each showed "Bernard Roy Kurio" as employer and owner, and each bore plaintiff's employer identification number. One was prepared for Drywall, the other for Sheetrock. For convenience I will sometimes refer to them as the Drywall and Sheetrock returns, respectively.

The Drywall return was filed on Form 941, revised July 1965. In the appropriate spaces, plaintiff's name, identification number, and Drywall trade name were properly filled in. The other return was filed on a preaddressed Form 941, revised October 1965. The address label correctly indicated plaintiff's name, identification number, and trade name of Sheetrock.

Since no deposits had been made during the fourth quarter of 1965 under the Drywall trade name, that return was accompanied only by an itemized list of the wages paid each employee under the trade name during the quarter and a check for $506.77, the full amount of the taxes shown due under the Drywall trade name for the quarter.

The Sheetrock return was not so simple. It was accompanied for purposes of substantiation, not only by an itemized list of wages paid each employee under the Sheetrock trade name during the quarter and a check for $2,967.51 (the balance shown due under the Sheetrock trade name for the quarter), *but also* by the two validated Federal Depositary Receipts evidencing the deposits made during the quarter and a tabulation correcting wage information submitted for prior quarters in substantiation of an adjustment of plaintiff's payroll tax liability. *On the back of the printed form of return, on a schedule provided for that purpose, the serial number, date of deposit, and amount of each depositary receipt, as well as the total amount deposited, were specified.* In appropriate spaces on the front of the return, the net adjustment and "Total of enclosed depositary receipts (From Schedule B, other side)" were entered. Save for an immaterial arithmetic error in transcribing the information from the back to the front of the return, it was perfectly prepared.

The Drywall and Sheetrock returns, with their enclosures, were received promptly at the Office of the District Director in Austin, Texas. There the routine of IRS processing commenced.

Although a few courts have had occasion to touch on the IRS system for processing tax returns, I have found no reported case describing the system since the advent of automatic data processing and the substitu-

---

**5.** No deposits were required because all of the union laborers' wages were earned during the third month of the quarter.

tion of the computer for traditional books of account. The system is complex, and any description, to be meaningful, must be detailed. An appreciation of the system and the halting journey through it of the Drywall and Sheetrock returns is necessary to a thorough understanding and disposition of the settlement issue. Therefore, even though such detailed description substantially lengthens this memorandum opinion, it is included as part of the background of the settlement negotiations.

■ For the past twenty years or more the IRS has gradually been developing a system to utilize computers and other technological innovations to speed the processing of the many millions of tax returns it receives annually. Various stages in the development of this system, which is constantly undergoing modification to render it faster, more efficient and less costly, are described in the literature.[6] Many aspects of its operation from early 1966 until late

1967 were also developed in the record of this case through testimony by government personnel at trial.[7]

Until November 2, 1966, with few exceptions all returns were filed by the taxpayer with the appropriate district director. There, envelopes were opened, a notation made on the return to indicate whether payment accompanied it, payment checks removed and deposited, changes in name and address noted, and sometimes other clerical tasks performed. The returns were then shipped to the regional computer Service Center, likewise in Austin, for recordation through automatic data processing.[8]

At the Service Center, each return is assigned a document locator number for identification. The returns are then sorted into blocks (small groups of returns with similar characteristics, e. g., income tax returns with refund claims), and the blocks are assembled into batches. Use of document locator numbers, blocks, and batches

6. The authoritative description is published periodically by the Commissioner of Internal Revenue in the Federal Register. The latest such statement of IRS organization and functions is dated January 20, 1970, and is published at 35 Fed.Reg. 2417–56. A prior version is quoted at length in 9 Mertens §§ 49.03–.79. Other descriptions may be found in *Internal Revenue Service ADP Procedure,* 19 A.B.A. Sec. on Tax. Bull. 74 (1966); Meek, *ADP's Tax Administration Revolution: Its Advantages, Effects, and Problems,* 24 J.Tax. 304 (1966); Barron, *The Processing Cycle: What Happens from Filing Date to Action Date,* 24 J.Tax. 306 (1966).

7. The description which follows is taken from the testimony in the record supplemented by the sources cited in the preceding note, the contents of which are judicially noticed. A careful search by the Court has disclosed that except where indicated below, the sources judicially noticed accurately describe the current operation of the system as described in the current IRS organizational statement dated January 20, 1970. Because of the authority of the sources noticed (their authors being, respectively, the IRS itself, a special committee formed by the American Bar Association Section on Taxation, and two officials within regional service centers), the Court has relied upon them as accurate.

The Court referred to the cited material in reaching its findings in order to appreciate the full import of the testimony developed at trial, concerning the handling of the Drywall and

Sheetrock returns during processing. Moreover, the evidence at trial retraced the journey of the returns through the Service Center in considerable detail, but did not fully explain how the processing system is set up or how responsibility is divided between the National Computer Center, the Service Center, and the Office of the District Director. The sources judicially noticed filled in the gaps. Also, reference to the sources judicially noticed was necessary to an understanding of the testimony and exhibits in the record; it thus was akin to reference to dictionary definitions. See *Weaver v. United States,* 298 F.2d 496, 498–99 (5th Cir. 1962). See generally 9 J. Wigmore, Evidence §§ 2565, 2568a, 2571, 2580, 2582, 2583 (3d ed. 1940). See also 44 U.S.C. § 1507.

8. By a 1966 amendment to the Code, Act of Nov. 2, 1966, 80 Stat. 1107, Congress authorized the IRS to require taxpayers to file returns directly at the Regional Service Centers, rather than first filing with the District Director. The amendment's purpose was to permit elimination of the expense of double handling and transshipping, and to permit the IRS to take full advantage "of the economies inherent in volume processing." S.Rep.No.1625, 89th Cong., 2d Sess., 3 U.S.Code Cong. & Admin. News pp. 3676, 3678 (1966). In the current IRS organizational statement, initial processing is described in § 1117.26, 35 Fed.Reg. 2446–47 (1970).

is intended to minimize the risks of losing or misplacing returns.

The next step is an examination of each return by an employee in the Document Analysis Branch,[9] referred to in the literature as a "specialist." The specialist determines whether the return contains all required information, detects errors and omissions which would render the return unsuitable for keypunching, and identifies the information on the return which will be fed into the computer. Returns which the specialist deems deficient [10] are diverted to other personnel responsible for contacting the taxpayer to rectify the error or supply the omission. After the return has been rendered suitable for further processing, it is reintroduced into the flow of returns found acceptable to the computer by the specialist in the first instance.

The specialist's identification of the data to be fed into the computer permits other, lower-graded personnel to punch input cards routinely.[11] After the cards have been punched and the punching verified, the cards for each block are run through the Service Center computer. The computer tests the cards for faulty punching and order and mathematically verifies the information taken from the returns. Errors it detects are printed out in error registers. By comparing the error registers and punched cards with the original returns, personnel in the Error Resolution Branch [12] detect IRS generated errors and identify taxpayer generated errors. The former are corrected and the computer run repeated. Taxpayer generated errors which cannot be

resolved are noted and this information placed with the output magnetic tapes containing the data taken from returns which the specialist has determined for the computer that it will accept.[13]

The output tapes generated by the computer at the Service Center are shipped to the IRS National Computer Center near Washington, D.C. This facility contains the Service's master file modules, its tax information for all years for all taxpayers. The magnetic tapes from the Service Center are fed into the computers there to update the master file modules. The computers are programmed to analyze the information in the master files and detect "ostensibly improper deviations from the tax laws." [14] They generate output magnetic tapes indicating rights to refund, certain kinds of delinquencies, and returns with unusual characteristics. The refund tapes are forwarded to the Treasury Department, where they cause refund checks to be printed and mailed. The other magnetic tapes are sent back to the Service Center, where they generate appropriate action by personnel there or in the office of the District Director.

Returning now to the journey of plaintiff's returns through the system just described, plaintiff's Drywall return for the fourth quarter of 1965, on its receipt February 7, 1966 in the office of the District Director at Austin, Texas, was stamped "Rec'd With Remittance." On the 42d day of 1966 (February 11) it was given a document locator number, checked by processing clerks for mathematical accuracy, completeness, and the presence of any necessary

---

9. Now called the Examination Branch. See § 1117.262 of the current IRS organizational statement, 35 Fed.Reg. 2247 (1970).

10. In the vernacular of the IRS, it is said that the computer will not accept the returns which are in fact rejected by the specialist. In other words, the human and mechanical functions have become so interrelated and interdependent that in the process such functions are practically equated and merged into one concept, "The computer." But, whether or not the computer will accept a given return is not determined mechanically by the computer only. The specialist and the machine share in the determination.

11. The current IRS organizational statement indicates that transcription of the information on returns is achieved in a number of ways, including optical character recognition. See § 1117.27, 35 Fed.Reg. 2447–48 (1970).

12. Now called the Error Correction Branch. See § 1117.263 of the current IRS organizational statement, 35 Fed.Reg. 2447 (1970).

13. *See* note 10, *supra.*

14. *Internal Revenue Service ADP Procedure,* *supra* note 6, at 75.

exhibits, and found to be suitable for entry into the computer. A keypunch operator then entered the information contained in the return onto computer cards. This information, after transfer to magnetic tape and verification in the Service Center, was forwarded to the National Computer Center for entry in plaintiff's master file module for the fourth quarter of 1965.

A printout or transcript of plaintiff's master file module for the fourth quarter of 1965 was introduced in evidence. It is valuable evidence of how plaintiff's returns for that quarter were processed, for its entries correspond to all entries made for that quarter in the module. However, the record reflects that such a printout will never be furnished by the IRS to a taxpayer, even on request. Thus even had plaintiff suspected that the IRS had made a mistake in processing his returns, he would have been denied the opportunity to help discover the mistake and assist in its correction.

The printout which was introduced in evidence reveals that the information on the Drywall return caused two transactions to be recorded in plaintiff's master file module for the fourth quarter of 1965: the filing of the return (which appears as an "assessment" or debit on the transcript), and the receipt of payment (which appears as a "credit"). Since full payment accompanied the return, after these transactions the module continued to indicate a zero balance in plaintiff's account for the fourth quarter of 1965.

Only one other group of transactions attributable to the filing of the Drywall return is reflected in the printout. This was the assessment of a penalty and interest for late filing (the return was one day late), and a subsequent payment of the penalty and interest.

The date of receipt of Sheetrock's fourth quarter return for 1965 was not stamped on the return, nor does the record otherwise reflect when that return reached either the office of the District Director or the Service Center. However, it was received somewhere within the IRS on or before the 40th day of 1966 (February 9), for on that date a document locator number was stamped on the return and on the check which accompanied it, and the latter was deposited by the Government. The check which accompanied the return was dated January 31, 1966 and drawn on the "Kurio Drywall Company" account, Gulfgate State Bank, Houston, Texas. It was signed by "Mrs. B. R. Kurio" but bore plaintiff's identification number and the legend "4th Qtr 941." It was paid by the bank February 11.

The Government conceded at trial that the two Federal Depositary Receipts totaling $7,967.83 which plaintiff had purchased during the fourth quarter of 1965 were enclosed with the Sheetrock return. However, during the interval between the receipt of the return by the IRS and the inspection of the return by one of several processing clerks, the enclosed depositary receipts for the quarter were mislaid or misplaced. Since the return was not stamped "Rec'd With Remittance," like the Drywall return, it is possible that the depositary receipts became separated in the mail room prior to inspection of the return by one of the mail handlers. But wherever it occurred, the depositary receipts were misplaced, and this simple, routine clerical mistake by IRS personnel, unknown and uncommunicated to plaintiff, compounded his problems with the IRS, which had their genesis in the test case initiated by the IRS.

Some processing clerk, upon finding that the depositary receipts were not present, made a notation on the return to indicate that no depositary receipts had been enclosed, which was contrary to evidence on the back of the return and the true facts. That clerk or some other made another notation elsewhere on the return to indicate that the claimed adjustment had not been substantiated. Eventually, when processing of the Sheetrock return for the fourth quarter of 1965 was completed in September 1967 (eighteen or nineteen months after receipt), credit for the claimed adjustment was allowed. At trial one of the government officials speculated that this was due to a mathematical error or to an administrative decision to waive substantiation.

On the whole record the more reasonable explanation is that the tabulation substantiating the claimed adjustment was detached from the remainder of the return at the same time as the depositary receipts, and later located within the Service Center and reaffixed to the return; and, I so find.

Once it had been discovered that no depositary receipts or substantiation of the claimed adjustment was attached to the return, some clerk, presumably a specialist, determined that the absence of those documents rendered the return unsuitable for further processing (unacceptable to the computer), specifically for processing by the keypunch operators. This clerk marked the return with a "Reject" stamp during the 11th week (the middle of March) of 1966, and diverted it as an "imperfect" return to the Error Resolution Branch. What transpired there will be explained in due course.

The Government's first attempt to contact plaintiff with regard to his Sheetrock return was dated April 6, 1967, fourteen months after receipt of the return, together with two Federal Depositary Receipts and other substantiation at the Service Center. Apparently the depositary receipts had been located when the letter was written, since it identified them by serial number, date, and amount, and stated that additional information was needed to process them. The letter also identified the Sheetrock return for the fourth quarter of 1965, and correctly stated the total tax shown due thereon as $10,935.34. The sum of the depositary receipts was deducted from the total tax shown due, leaving a difference of $2,967.51. The letter asked plaintiff how the difference had been paid. It was signed, "Chief, Correspondence Unit." [15]

Plaintiff immediately responded that the difference had been paid by check, and enclosed a copy of the check.

The printout or transcript of the master file module for plaintiff's account for the fourth quarter of 1965 reflects that on some date between May 8 and June 2, 1967, the deposits evidenced by the two depositary receipts were credited as payments for that quarter. The two transactions concerning the two depositary receipts reflected in the transcript are identified in the transcript by document locator numbers which reveal their date as May 8, but the record does not reflect the nature of the transactions. However, because the amount shown due on the Sheetrock return was not entered in his master file module as a debit on that date, it is clear that the transactions of May 8 were not the completion of processing of that return. Such completion was not to come for four months more.

Prior to the entry of the depositary receipt credits in plaintiff's master file module on May 8, the only entries there concerned plaintiff's Drywall return. Had the processing of the Sheetrock return been completed, the tax reported by plaintiff on that return would have been reflected in the module as a debit entry. Had the check which accompanied the Sheetrock return also been processed, its entry would have been reflected in the module as a credit, a partial satisfaction of the tax liability declared by plaintiff in his return. But neither of these entries had been made. Therefore, on May 7 the module reflected a zero balance, not an unpaid assessment for the fourth quarter of 1965 equal to the amount of the misplaced depositary receipts.

15. The record does not reflect whether the Correspondence Unit was a part of the Error Resolution Branch, or working independently of that Branch, and the current IRS organizational statement is not any clearer than the record. It says that the Error Correction Branch "[p]erforms research, perfects and resolves processing and taxpayer errors detected during the work cycles within the Service Center," § 1117.263, 35 Fed.Reg. 2447 (1970), but does not say how. There is a "Correspondence Section" in the "Taxpayer Service Branch" of the "Taxpayer Service Division" (the Error Correction Branch" of the "Taxpayer Service Division" (the Error Correction Branch is in the "Examination Division"), but the description of its functions does not indicate whether it is responsible for correspondence required by the Error Correction Branch or not. See § 1117.-283(2), 35 Fed.Reg. 2449 (1970). Therefore, the record is not clear as to whether or not the work of the Correspondence Section and Error Resolution Branch was correlated.

Because on May 7 the tax declared by plaintiff on the Sheetrock return to be due for the fourth quarter of 1965 had not been entered in his master file module, entry of the transactions of May 8 in the module created a credit balance in his account (an apparent overpayment), not a reduction in the debit balance (an apparent partial satisfaction of a tax liability). From there, the automatic processes as programmed in the computer took over and the incompleteness of plaintiff's accounting record as reflected in the module was automatically converted into erroneous statements of plaintiff's account, as will next be explained.

IRS policy requires that overpayments be credited to accounts showing deficiencies before being refunded, and that net overpayments (i. e., overpayment credits exceeding the total of all deficiencies for that taxpayer) be refunded promptly. Acting, as programmed, to implement this policy, the computer on June 2, 1967, automatically transferred the apparent overpayment in plaintiff's account for the fourth quarter of 1965 to another account reflecting a deficiency, plaintiff's account for the first quarter of 1964. This produced the unexplained credit in that account brought to White's attention by Mrs. Jennings late in the summer of 1967.

Plaintiff was never notified by the IRS of this apparent overpayment, that is of the reason for the transfer of credits to his 1964 account. He was never notified of the fact of the transfer except by Mrs. Jennings, who was unable to give a reason. All that either plaintiff or White knew in August 1967 was that approximately $8,000 had been credited to one of the accounts in suit. And this is all that Mrs. Jennings knew. Moreover, while it is apparent that the computer "knew" the source of the credits in the sense that the master file module for the fourth quarter of 1965 reflected the transfer out of that account, *there is no evidence in the record that any person within the IRS* (as distinguished from the master file module stored near Washington, D.C.) *had even that much knowledge.* Certainly no *responsible person* knew all the

facts at that time, *for no action was taken to correct the mistake* which is manifest from a comparison of the Sheetrock return with the computer transactions in the 1965 account as reflected by the master file printout or transcript.

On August 18, 1967—after talking to Mrs. Jennings, but, according to White's testimony, before learning that the 1965 deposits had been misapplied by the computer—White wrote a letter to Government counsel, offering to compromise the 1963–1964 assessment against plaintiff for a total of $2,368.84, representing $1,257.95 in taxes and $1,110.89 in interest. In the letter White stated that plaintiff "has made payments and/or has received credits with respect to the taxes involved" in the amount of $8,188.41, the total being computed from the information (dates and amounts) furnished by Mrs. Jennings a few days prior to the date of the letter. Plaintiff proposed in the letter to concede liability for a portion of the taxes assessed against him and dismiss his suit with prejudice. The Government would apply the $8,188.41 already in his account and the $2,368.84 he proposed to pay to liquidate the conceded liability and would dismiss its counterclaim with prejudice, thereby disposing of the litigation. The offer was to expire automatically unless plaintiff received notice of acceptance on or before October 20, 1967.

On August 26, at Government trial counsel's request, White addressed another letter to him denominated an "amendment to [plaintiff's] offer to compromise," in which he extended the duration of the offer to November 15, and made one other change not material here. White consented to the extension but made it clear that plaintiff was eager to dispose of the case, if not by compromise prior to November 15 then by trial on the previously set date of December 4.

During all this period of time, from March 1966 through August 1967, the rejected Sheetrock return rested in the Error Resolution Branch in the Service Center. Under IRS procedures, the purpose of diverting "unsuitable" returns to the Error

Resolution Branch is to correct errors made during processing and to request the taxpayer to correct errors, omissions, and discrepancies detected during processing. Notations made on the Sheetrock return by a specialist before it reached the Error Resolution Branch reflected that payment of the indicated balance due had accompanied the return, but that the depositary receipts and tabulations substantiating the claimed adjustments were missing. Thus the IRS procedures then in effect required personnel in the Error Resolution Branch, upon receipt of the "rejected" Sheetrock return, to search for the missing depositary receipts (the existence and transmittal of which were clearly shown in the space provided on the return) and adjustment substantiation, and *if unable to locate them, to notify the taxpayer of their absence and request an explanation.*

Testimony at trial indicated that IRS procedure requires Error Resolution Branch personnel to mail a notice to the taxpayer requesting any missing substantiation. If there is no reply, the request is furnished to personnel in the Tax Assister section in the Houston IRS office, who make two attempts to contact the taxpayer. If the local personnel are unsuccessful, they notify the Service Center, which resolves the ambiguity against the taxpayer and adjusts his tax liability accordingly.

At trial the IRS official who described such procedure referred during his testimony to an internal IRS memorandum apparently reflecting that attempts to contact plaintiff had been unsuccessful. The memorandum was not offered in evidence. *The record does not reflect that the taxpayer plaintiff was ever contacted.* It reflects only that the return was not perfected, and that it was again marked with a "Reject" stamp by some clerk somewhere within the Service Center during the 32d week (early August) of 1966. *Although the back of the return identified the missing depositary receipts by serial number, date, and amount, there is no evidence that anyone ever attempted to obtain substantiation of the deposit credits claimed by plaintiff, either from the Federal Reserve System or from plaintiff himself. Nor is there any evidence that anyone ever attempted to obtain substantiation of the claimed adjustments from plaintiff.*

■ Proof that something never happened is difficult to make. However, I am convinced from my examination of the rejected Sheetrock return, the other internal IRS documents introduced in evidence at trial, and the internal procedure of the IRS to record each such action, that any effort to substantiate the claimed deposits or adjustments would have been reflected by an appropriate notation on the return. On the whole record, plaintiff's prompt response whenever requests for information were addressed to him, White's long acquaintance with many of the Houston IRS personnel and their knowledge that he represented plaintiff, and the absence of any affirmative indication on the Sheetrock return or elsewhere in the record that any notification was ever sent, *I find that the IRS never sought plaintiff's help in its effort to process his Sheetrock return.*[16] This failure

16. The record is silent as to why the IRS did not notify the taxpayer plaintiff and request an explanation or assistance in perfecting the return. It reflects only that the return was not perfected. Except for the second "Reject" stamp mentioned above, nothing in the record reveals what happened to the return once it reached the Error Resolution Branch. However, even without the documents which were missing, the return was quite complete. The missing depositary receipts which had been mislaid but were later to be found by the IRS were clearly identified on the return by serial number, date, and amount; and the lengthy tabulation reflecting the wages paid employees during the quarter was attached to the return. Thus it is quite likely that the clerk in the Error Resolution Branch to whom the return was referred assumed that the missing documents had been lost or mislaid by the IRS during processing. That clerk undoubtedly set the return aside to await further action, until the missing documents might turn up.

But whatever the reason for the failure to contact plaintiff, such failure was a severe invasion of plaintiff's rights. Mistakes are inevitable; they cannot be prevented. However, the duty of the Error Resolution Branch was to take steps to clear up the mistake by contacting plaintiff. Whether plaintiff had failed to

of the IRS to contact plaintiff and promptly resolve the error referred to the Error Resolution Branch had a disastrous effect on plaintiff's posture before the IRS. It was the immediate cause of the incomplete recordation in the computer both in the Austin Service Center and the National Computer Center of what had transpired, the transfer of the credits out of the 1965 account, significant subsequent transactions, and other consequences adverse to plaintiff which were not of his making.[17]

include the missing documents (and thus was responsible for their absence), or the documents had been mislaid during processing, an inquiry of plaintiff would have given plaintiff notice and the opportunity to assist the IRS in restoring the return to the completeness with which it was originally submitted, in order that his accounts as kept in the IRS computer not be distorted. The duty of the Error Resolution Branch was to prevent the mistake from delaying processing or otherwise injuring plaintiff— to forestall the precise events which later beset the innocent taxpayer.

The entire practice of diverting "imperfect" returns to the Error Resolution Branch to correct taxpayer errors before processing is completed may well be inconsistent with the "self-assessment" theory of taxation. The law requires each taxpayer to make out a return, compute the tax owed, file the return, and pay the tax shown due. 26 U.S.C. §§ 6001, 6011, 6651–55; 9 Mertens § 49.81. The law then requires the IRS to assess the tax shown due on the return:

§ 6201. *Assessment authority*

(a) *Authority of Secretary or delegate.* —The Secretary or his delegate is authorized and *required* to make the . . . assessments of all taxes . . . imposed by this title . . . which have not been duly paid by stamp . . . . Such authority shall extend to and include the following:

(1) *Taxes shown on return.*—The Secretary or his delegate *shall assess* all taxes determined by the taxpayer . . . as to which returns . . . are made under this title. [Emphasis added.]

Errors in the return may be corrected in a supplemental assessment at any time within the limitation period. 26 U.S.C. § 6204.

A commentator has noted:

The principle of self-assessment by the taxpayer would collapse if the Commissioner were completely at liberty to reject the taxpayer's statement of income simply because such statement of income does not approximate the average income of the taxpayer's occupational classification. The tax is not imposed upon what income should be but upon what income actually is. But the privilege of original self-assessment accorded the taxpayer carries with it the burden of support through the maintenance of records which clearly and accurately reflect income. 9 Mertens § 49.100.

The comment applies not just to income taxation, but also to excise and withholding taxation. Its reasoning is pertinent not merely to apparent unreasonableness of reported income, but also to errors apparent on the face of the return. The law seems to and should require that processing of each return continue until all information the return does furnish has been entered in the Government's books of account, which with the advent of automatic data processing have become the computer memory bank in Martinsburg, West Virginia. Any error, discrepancy, omission, or failure to pay tax may be noted during processing, but should not retard processing. There would be time enough to correct mistakes after recordation of the taxpayer's reported liability.

17. Considering the mass of returns handled in the Service Center, some errors are to be expected. But the system of processing tax returns is fatally defective if mistakes during processing are never discovered. Evaluated from the standpoint of perfecting the system, the most serious mistake was not the temporary loss of depositary receipts and other misplaced documents, but the system's failure to process the Sheetrock return at all. The facts here demonstrate that the automatic data processing system never "learned" that the processing procedures had not performed as they should. It is for this reason that the failure to process was not corrected. Rather the failure to process was compounded within the system until it caused an adverse effect outside the system, the erroneous bill which was sent to plaintiff. In cybernetics the inability of a system to "learn" of its own failure is ascribed to inadequate feedback. Stated differently, feedback is "the property of being able to adjust future conduct by past performance." N. Wiener, The Human Use of Human Beings 33 (1954). *See also id.* at 24–25, 61. Had feedback within the IRS processing system been effective the failure to process the Sheetrock return (the system's past performance) would have been detected and rectified within the system or brought to the attention of some responsible person before the depositary receipt credits were transferred out of plaintiff's 1965 account. Feedback thus would have permitted future processing of the credits to reflect the past progress (or lack thereof) of the Sheetrock return and its other attachments through the processing system.

While automation and other high-speed techniques of data processing are invaluable as time and money savers, they do not eliminate the need for supervision by qualified people and the exercise of judgment by responsible

Apparently as a result of the memorandum just referred to, personnel in the Service Center in Austin caused the computer there to prepare a form of deficiency (Treasury Dept. Form 4188) *dated September 1, 1967,* indicating that plaintiff's withholding and FICA tax for the fourth quarter of 1965 had been adjusted to leave a balance due in the amount of $8,243.06. Plaintiff received the notice a few days later. White testified at trial that after studying the information printed on the form, he sensed that somehow the credit for the two depositary receipts purchased during the fourth quarter of 1965 had been misapplied to the first quarter of 1964 and was the source of the credits in the 1964 account. Although the form was so obscure that White could not confirm his intuition, he immediately became concerned that this circumstance might jeopardize the settlement.

On September 5, a few days after the deficiency Form 4188 was prepared in Austin, plaintiff's account for the fourth quarter of 1965 was assigned for collection to Franklin A. Heath, another collection officer in the Houston IRS office. Between September 14 and October 16, after talking with Mrs. Jennings, Heath contacted White to inform him that he had received plaintiff's account for the fourth quarter of 1965. White told Heath that plaintiff had paid the taxes for the quarter and asked Heath to run a check on the account. Heath agreed to do so, but advised White that a tax lien for the amount claimed for

people. On the contrary, systems employing such techniques require human control of a higher order because they permit (a) data to be secreted away in the recesses of a computer memory bank and (b) line responsibility to be fragmented among a multitude of clerks each with a small specific task. If one person is given a specific tax return and told to enter the information it contains on the Government's books with accuracy, that person, acting rationally, will look to see whether one step in the process has been accurately completed before moving to the next step. This is feedback, "the property of being able to adjust future conduct by past performance," for if the hypothetical person notes that prior processing has failed to achieve the desired results, he will adjust his future conduct accordingly.

In an automated system, however, the Government cannot reasonably rely solely on the rational judgment of the personnel on the line. The personnel on the line—the clerks and machines who actually perform the processing functions—are instructed to perform functions, not to think. They will not detect processing errors unless the person in charge of the system designs methods and procedures for exposing and correcting the system's failures, and implements those methods by assigning specific functions to qualified line personnel. Thus it is the responsibility of the Government as the operator and supervisor of the automated system for processing tax returns to design feedback into the system. If such is not done, or the feedback designed is ineffective, once made any mistake will compound until some aspect of the system breaks down entirely. Such a breakdown occurred in the processing of plaintiff's Sheetrock return.

In this way automation gives the supervisor, not line personnel, the responsibility of determining whether the system does what it is supposed to do or not. He discharges this responsibility by assigning specific tasks to the line personnel calculated to discover and correct the system's failures promptly. How great such responsibility is has been described by Professor Norbert Wiener, the father of cybernetics:

> Any machine constructed for the purpose of making decisions, if it does not possess the power of learning, will be completely literal-minded. Woe to us if we let it decide our conduct, unless we have previously examined the laws of its action, and know fully that its conduct will be carried out on principles acceptable to us! On the other hand, the machine like the djinnee, which can learn and can make decisions on the basis of its learning, will in no way be obliged to make such decisions as we should have made, or will be acceptable to us. For the man who is not aware of this, to throw the problem of his responsibility to the machine, whether it can learn or not, is to cast his responsibility to the winds, and to find it coming back seated on the whirlwind.
>
> I have spoken of machines, but not only of machines having brains of brass and thews of iron. When human atoms are knit into an organization in which they are used, not in their full right as responsible human beings, but as cogs and levers and rods, it matters little that their raw material is flesh and blood. *What is used as an element in a machine, is in fact an element in the machine.* Whether we entrust our decisions to machines of metal, or to those machines of flesh and blood which are bureaus and vast laboratories and armies and corporations, we shall never receive the right answers to our questions unless we ask the right questions.
> . . . Wiener, *supra,* at 185 (emphasis in original).

the fourth quarter of 1965 would be filed forthwith. This was accomplished on September 25.

On September 14, 1967, before his conversation with Heath, White had sent a letter to the District Director in Austin stating that plaintiff had paid his payroll taxes for the fourth quarter of 1965 in full, and suggesting that some mistake must have been made in the preparation of the deficiency Form 4188.

Thereafter, but prior to October 16, Heath informed White that the deposits for the fourth quarter of 1965 had indeed been misapplied to the first quarter of 1964. This fact should have been known months earlier to personnel in the Error Resolution Branch, through which the facts were readily ascertainable from plaintiff taxpayer. When so ascertained, they could and should have been recorded in the computer immediately. However, insofar as the record reflects, Heath was the first person in IRS who appreciated just what had occurred and how IRS had incorrectly applied said payments and thereby misstated plaintiff's account in the notice dated September 1, 1967. *To correct the misapplication Heath requested that a reversing entry be made in the records.* His request for adjustment was addressed to his superior in Austin, and read as follows:

> Two forms 941 were filed for the fourth quarter of 1965. Both returns were paid in full and included depositary receipts, purchased during that quarter. A transfer of credit, in the amount of $8159.42, was made from this quarter to the first quarter of 1964. Please reverse this transfer and abate any assessed interest. This is necessary because there is a court case that is pending and involves the years 1963 and 1964, and payments made by the taxpayer and intended for 1965 should not be allowed as a credit for a prior year. I am recharging the 12–31–65 941 return to the Chief, Taxpayers Service Branch, and it is attached to this request.

Also during the middle of October Government trial counsel telephoned White to say that he was ready to process the August 18 offer, but that due to a mathematical error in White's computation, the indicated tax liability was incorrect and the amount to be paid would have to be increased to $4,200. The record is unclear as to whether Government counsel had prior notice of Heath's discovery of the misapplication of plaintiff's payments. However, White testified that he advised Government counsel of the misapplication of the 1965 payments to the 1964 liability and of his fear that the settlement might break down.

White testified that he decided to abandon his earlier offers of settlement. The letter he wrote in consequence was dated October 16. By its terms, it "contain[ed] Plaintiff's amended offer," although it did not expressly withdraw the prior ones. (Nor is there any other evidence of any express withdrawal.) The letter stated that plaintiff "hereby offers to compromise all of the taxes" assessed for 1963 and 1964 by paying the Government the sum of $4,200. It made no reference to any of the credits in plaintiff's accounts for the periods in suit. Nor did it contain an offer to concede liability for any of the assessed taxes. "[T]he offer contained in this letter" was to expire unless notice of acceptance was received by November 15.

On October 18, after White had notified Government trial counsel of the misapplication of payments by the IRS, the latter's superior in the Fort Worth office acknowledged receipt of plaintiff's "offer dated August 18, 1967, and the letters amending such offer" and stated the Government's "interpretation" of plaintiff's "proposal." With one exception, the "interpretation" is a precise paraphrase of the offer "contained" in the October 16 letter. That exception, when read with the language already quoted, suggests that the Government may not have considered the October 16 letter to have entirely superseded the prior letters. It is nevertheless certain that the Government understood the importance plaintiff attached to the November 15 cut-off date.

On November 15, the day plaintiff's offer was to expire, an official in the Tax Division of the Department of Justice in Washington initiated a Government teletype reading "Offer accepted. Letters follow." However, this message was not relayed to the Government's teletype facility in Houston until 7:51 a. m. the next day. Personnel in the Houston office notified White's office at 8:20 a. m. by telephone. Later that morning White sent a telegram to the Tax Division advising the Government of his efforts to obtain a transfer of the funds erroneously credited to plaintiff's account for the first quarter of 1964, and asking if in view of this development the Department wished "to withdraw [its] acceptance."

When White received no response to his telegram, he wrote Government trial counsel on November 20, confirming the prior telephoned advice to him of the erroneous credit and advising him of the exchange of telegrams. On November 22 White wrote Government counsel again, describing with some detail "what we conceive to be the mixup," and again inquiring whether the Government wished to withdraw its acceptance.

On November 27, White telephoned Government counsel and was advised that the Justice Department considered the case settled. At the conclusion of their conversation, White wrote Government counsel that plaintiff remained willing and prepared to settle the case by paying $4,200, but would not pay $7,400 (the approximate amount of the credit from the fourth quarter of 1965 which was then known by all concerned to have been misapplied by the computer) in addition to the $4,200. White further stated in the letter that he had been notified by the District Director's office that day that the misapplied $7,400 had been transferred back to the fourth quarter of 1965. On plaintiff's behalf he made an urgent request for an immediate reply.

The "letter" which was to have "followed" finally reached White the next day. Under date of November 27, the "Chief, Review Section" of the Tax Division of the Department of Justice in Washington announced that plaintiff's offer had been accepted by telegram and that the Government declined to withdraw the acceptance. The letter added that the Government construed plaintiff's offer as conceding that he owed the Government a total of $12,388.41 —the credits and payments itemized in the August 18 letter plus the additional $4,200 offered in the October 16 letter.

White responded November 30. His letter stated that the October 16 "amended offer" had superseded and replaced the August 18 offer, and that the acceptance as construed by the Government was unacceptable to plaintiff.

On a date apparently preceding the Government's letter of November 27, 1967, *the Tax Division* of the Department of Justice, acting through its trial counsel in this case, *contacted the District Director's Office in Austin and requested that the credits not be retransferred to the fourth quarter of 1965. The request was complied with,* and the deposit receipt credits remain to this day incorrectly recorded in plaintiff's account for the first quarter of 1964, rather than the fourth quarter of 1965.

Before the Tax Division countermanded Heath's request for correction, the misstatement of plaintiff's accounts was apparently a bona fide mistake. On the other hand, when it countermanded Heath's requested correction of the misapplication, the Tax Division acted with knowledge of Heath's analysis and request. *Knowing that plaintiff had paid all taxes due for the fourth quarter of 1965, the Tax Division nevertheless perpetuated the mistake as recorded in the computer that plaintiff owed over $8,000 for such quarter.* The Tax Division sought to force application of the payments remitted by plaintiff in satisfaction of the 1965 liability (to which liability plaintiff was entitled to have them applied), to the claimed 1964 tax liability. Apparently the Tax Division was attempting to settle the refund suit for $4,200 plus the 1965 payments misapplied to the 1964 account, and thereby empower the Government to collect the 1965 taxes a second time. Its conduct

has little in common with the errors which brought about misapplication of the payments tendered by plaintiff for the fourth quarter of 1965.

The foregoing is the background of the alleged settlement and the basis for the Government's motion for judgment.

## II. THE ALLEGED CONTRACT

In its motion for judgment, the Government asserts that a contract exists and that it should be enforced in accordance with the terms of its November 27 letter. Plaintiff responds that that letter does not state the terms of his "amended offer." In opposition to the Government's motion for judgment and to its construction of the contract, plaintiff levels three attacks. For two reasons, he contends that there was no contract: first, because the acceptance was untimely, and second, because the acceptance was not responsive to his offer. Alternatively and consistent with his construction of his amended offer, plaintiff argues that if there is a contract it should be construed to terminate the litigation upon payment of $4,200, leaving him free to require the Government to apply the deposit receipt credits in satisfaction of his liability for the fourth quarter of 1965.

Contracts settling or purporting to settle tax litigation have been before many courts, but invariably the controversy has been presented in subsequent litigation. I have encountered no other reported case in which a court was asked, within the confines of the suit purportedly settled, to construe and enforce an alleged settlement. However, on the facts here, it is clear that I have jurisdiction.

▆ In the first place, besides filing the motion for judgment, the Government amended its counterclaim to allege the settlement as an alternate ground for recovery. 28 U.S.C. § 1346(c) expressly grants this Court jurisdiction of any Government counterclaim. *Belgard v. United States,* 232 F.Supp. 265 (W.D.La.1964); *cf. Cherry Cotton Mills, Inc. v. United States,* 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835 (1946) (construing the corresponding jurisdictional

grant to the Tax Court). Second, even if the counterclaim had not been amended, this Court would have had jurisdiction over a claim by plaintiff that the misapplied credits be transferred to his account for the fourth quarter of 1965. Such a claim would be one in recoupment and is permissible under the authorities. *Bull v. United States,* 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). Thus it is unnecessary to determine whether the principles of pendent jurisdiction also apply here.

### A. *Timeliness of the Government's Acceptance*

In his letter of October 16 White advised Government counsel that

The undersigned *must be advised* on or before November 15, 1967, that Defendant accepts the offer contained in this letter, and upon failing to *receive* such advice of acceptance this offer is *automatically* revoked as of November 15, 1967. (Emphasis added.)

Substantially identical language appeared in the letters of August 18 and 26. The Government's response of October 18 evidenced its understanding that acceptance would not be timely unless it actually reached White on or before November 15:

We are sure you understand that unless you *receive* from our Washington office a *formal notice* of acceptance, the Department [of Justice] is in no way committed to a settlement. (Emphasis and brackets added.)

Thus both parties expressed, in terms which could not have been more explicit, their understanding that the timeliness of notice was an essential condition of the offer. The risk of nonarrival was placed entirely on the Government.

The Government also understood the importance plaintiff attached to timeliness. The Government knew, and if it had no prior knowledge it was informed in White's letter of August 26, that the assessments outstanding against plaintiff had placed him in "extreme financial straits" and he was intensely desirous of trying the case, if

it had not been previously settled, on December 4, the date set for trial.

On November 15, 1967, the Department of Justice, Tax Division, prepared an order for the communications branch of the Government to teletype the message "Offer accepted. Letters follow." to White in Houston. The teletype, however, was not received by the Government's communications office in Houston until the following day, November 16, at 7:51 a. m., and was not transmitted to White's office until 8:20 a. m. that day.

■■■■■ Having no rational alternative, the Government concedes that the teletype was late and therefore was ineffectual by itself to create a contract. *See generally*, 1 A. Corbin, *Contracts* §§ 35, 67, 74, 78 (1963 ed.) [hereinafter cited as 1 Corbin]; 1 S. Williston, Contracts §§ 50, 53, 76 (3d ed. W. Jaeger 1957) [hereinafter cited as 1 Williston]; *Restatement of Contracts* §§ 35(2), 40(1), 61, and comment a to § 40 (1932) [hereinafter cited as Restatement]. The Government's express statement in its October 18 letter prevented the late acceptance from binding it. And unless the Government is bound under a compromise, the taxpayer is not bound. *Botany Worsted Mills v. United States,* 278 U.S. 282, 289, 49 S.Ct. 129, 73 L.Ed. 379 (1929).[18] To overcome this obvious result, the Government urges that upon receipt of the late acceptance from the Government, plaintiff waived his earlier requirement that the acceptance be timely. Such a suggestion evidences a basic lack of understanding of the law of contracts.

■■■■■ By making an offer, a person creates in an offeree a power of acceptance. 1 Corbin §§ 11, 35; 1 Williston § 50; Restatement § 34. As he is free not to make any offer at all, a person making an offer is free to restrict the power of acceptance in any way, reasonable or unreasonable, that he may wish. 1 Corbin § 88; 1 Williston § 76; Restatement § 61. Unless the offeree exercises his power of acceptance before it expires, there is no contract, for there is no power to accept. Therefore, where the offer has terminated by lapse of time, an attempt to accept is ineffectual to create a contract.

■■■■■ A belated attempt to accept, although it cannot by itself (or in conjunction with the original offer) create a contract, does ordinarily evidence a willingness to enter into a contract along the lines set out in the initial offer. It thus may well constitute a counteroffer, or stated differently, may create a power of acceptance exercisable by the original offeror. 1 Corbin §§ 74, 89; 1 Williston §§ 92, 93; Restatement § 73. If so, a contract will arise if conduct by the original offeror following receipt of the late acceptance amounts to an acceptance of the counteroffer implicit in the late attempt to accept. But whether the counteroffer has been accepted must be determined by reference to the general principles governing acceptance, not some independent and distinct theory of "waiver." 1 Corbin § 74; 1 Williston § 93; Restatement § 73 comment a.

■■■■■ The Government's argument that the offeror may waive untimeliness does violence to the conceptual basis for contractual law. Accord, 1 Williston §§ 92–93; Restatement § 73; see 1 Corbin § 89. Conduct by the original offeror may amount to a renewal of his original offer or an acceptance of the counteroffer implicit in the

---

**18.** The statute of limitation problem present in *Cooper Agency v. United States,* 301 F.Supp. 871 (D.S.C.1969), and cases cited, is not present here. Plaintiff was eager to try the claims covered by the alleged settlement agreement, and tried them almost immediately after the settlement broke down. Therefore, as the Supreme Court said in *Botany,* 278 U.S. at 289, 49 S.Ct. at 132, I can say here that "without determining whether such an agreement, though not binding in itself, may when executed become, under some circumstances, binding on the parties by estoppel, it suffices to say that here the findings disclose no adequate ground for any claim of estoppel by the United States." Moreover, in *Cooper Agency* and similar cases the contract was complete save for a technicality required by statute. Here the alleged defects in the contract are independent of the statute. Plaintiff relies on general contract law.

defective acceptance. 1 Corbin § 89; 1 Williston §§ 53, 92–93; Restatement § 73 comment a. Once terminated, however, the original offer can never be revived.

■ Returning to the instant case, did plaintiff ever accept the Government's counteroffer? The Government's suggestion that he did borders on the irresponsible.

Upon learning of the Government's teletype purporting to accept plaintiff's offer, White sent a telegram to the sender of the teletype, an official in the Tax Division of the Department of Justice in Washington, D. C. A copy of White's telegram, introduced in evidence by the Government, reveals that it was communicated to the telegraph company at 10:50 a. m. Central Standard Time (11:50 a. m. Eastern Standard Time (EST)), sent by the company at 12:17 p. m. EST, received at the Department of Justice telegraph office in Washington at 12:24 p. m. EST, and received in the Tax Division there at 1:22 p. m. EST. Because of its significance to the Government's claim of waiver, it is here set out in full precisely as it was received by the Tax Division on November 16, 1967:

RE BERNARD R KURIO VERSUS UNITED STATES CA66–H–509 ADVISED YOUR TELETYPE RE ACCEPTANCE BY TELEPHONE THIS DATE WITHIN LAST SEVERAL WEEKS ADVISED BY DISTRICT DIRECTOR AUSTIN THAT PAYMENTS DESCRIBED IN PARAGRAPH 2 OF OUR LETTER OF AUGUST 18 1967 TO TATAR RESPECTIVELY OF $3,386.27 AND $4,049.45 ERRONEOUSLY CREDITED BY DISTRICT DIRECTOR TO KURIO'S 1963 AND 1964 ACCOUNTS AMOUNTS SHOULD HAVE BEEN CREDITED ACCORDING TO DISTRICT DIRECTOR TO 4TH QUARTER 1965 DIRECTOR NOW TAKING STEPS TO APPLY AMOUNTS TO 4TH QUARTER 1965 IN VIEW OF THE FOREGOING DOES JUSTICE DESIRE TO WITHDRAW ACCEPTANCE OF OUR COMPROMISE OFFER OF OCTOBER 16 1967 ADVISE

The Government suggests that by sending this telegram, White "waived" the untimeliness of the purported acceptance. Such suggestion has no basis in either fact or law. White's telegram was neither (a) a renewal of his offer, (b) an acceptance of any Government counteroffer, nor (c) (which is the same as (b)) a waiver of the delayed receipt. It is no more than an inquiry, a request that the Government state its position more precisely in view of the misapplication of payments by the Government identified in plaintiff's telegram.

This interpretation is supported by the importance plaintiff previously had attached to the timely receipt of notice. *Cf. NLRB v. Vapor Recovery Systems Co.,* 311 F.2d 782 (9th Cir. 1962); 1 Corbin § 67, at 277–79; *id.* § 78, at 339–40. White's telegram is insufficient to indicate that he and plaintiff no longer considered it important to reserve two weeks for trial preparation.

The interpretation is confirmed by the incontrovertible evidence that neither White nor the Government considered the Government's teletype as unequivocal. White sent his telegram and the subsequent series of letters in an effort to learn how the "letters" mentioned in the teletype might qualify the Government's apparent unequivocal acceptance. The Government, both before, in the October 18 letter, and after, in the November 27 letter, and in the teletype itself, manifested its insistence that it be the one to select the words in which the contract would be expressed. White's telegram merely expressed his desire that the Government be more explicit. In the circumstances here, his reference to "withdraw[ing an] acceptance" cannot have confused the Government.

Nor did White's subsequent efforts on plaintiff's behalf constitute an acceptance of any outstanding Government offer. His letters of November 20, 22, and 27 contained increasingly urgent pleas that the Government make its position clear. When coupled with these pleas, plaintiff's expressions in the November 22 and November 27 letters of his continued willingness to settle

the case by paying $4,200 did not accept anything. *Cf.* 1 Corbin § 11, at 25–26; id. § 15; 1 Williston § 26; Restatement § 25. Counsel for plaintiff plainly evidenced that the Government had never stated its position to him fully and precisely. The Government could not maintain that any of these letters is an acceptance of a Government offer, and indeed does not so contend here. They merely repeat the question first asked in White's telegram.

The final letter from White, on November 30, was a simple rejection. It also failed to create a contract.

■ Moreover, to create a contract, an acceptance must be unequivocal. 1 Corbin § 82; 1 Williston §§ 72–73; Restatement § 58 & comment a thereto. Since both parties viewed the teletype as qualified by the terms of the "letters" which were to "follow," it was so qualified. 3 Corbin §§ 538, 543A–B; 1 Williston §§ 20, 22, 23, 95, 95A.[19] Viewing the correspondence most favorably to the Government, its acceptance was not received by White until November 28, 13 days too late. White's only act thereafter, the November 30 letter, was an outright rejection. By no stretch of the imagination could it be considered a "waiver."

But this is not all. Even assuming for the sake of argument that plaintiff cannot complain of untimeliness, two other equally severe defects inhere in the alleged contract underlying the motion for judgment and the Government's counterclaim.

### B. Failure to Accept Unequivocally

■ As already mentioned, an acceptance, to create a contract, must be unequivocal. A conditioned acceptance may constitute a counteroffer, but does not without more bind either party.

The Government's two purported acceptances, its teletype and its November 27 letter, were both qualified, the teletype, by the terms of the "letters" which were to "follow," and the letter, by the restatement of plaintiff's proposal which it contained.

■ The equivocation apparent to both parties in the teletype has already been discussed. It could create no contract because neither party considered it unqualified.

■ The Government's letter of November 27 not only purported to restate the terms of plaintiff's offer; it also purported to set out their legal effect. An acceptance which attempts to restate the terms of an offer must be accurate in every material respect, or no contract will result—an inaccurate restatement can constitute no more than a counteroffer. 1 Corbin § 86; 1 Williston § 72. Moreover, an acceptance conditioned on the creation of certain specific legal relations creates a contract only if those relations flow naturally from the terms of the offer. If they do not, the purported acceptance is a counteroffer. 1 Corbin § 87; 1 Williston § 78.

■ Both of the stated principles prevent the Government's November 27 letter from creating a contract. I find that White's October 16 letter did supersede his prior letters and thus constituted a revocation of the prior offers. The offer outstanding thereafter was to compromise the litigation upon payment of $4,200, period. The Government's restatement of that offer, in its November 27 letter, was inaccurate, for it included an express abandonment by plaintiff of his attempts to arrange retransfer of the misapplied credits. And this inaccuracy was quite material.

Secondly, the Government's November 27 letter specified a legal consequence which does not flow naturally from the terms of the offer "contain[ed] in" the October 16 letter. By the carefully worded terms of

---

19. Some courts have read certain passages in Professor Williston's treatise, e. g., § 94, at 339; § 95, at 349–50, as always requiring the court construing a contract to adopt the meaning a reasonable person would give the words used by the parties. However, reference to the passages cited above, as well as to § 94 at 343–44, establishes that Professor Williston would not give the teletype here an interpretation different from that given by both plaintiff and the Government.

the November 27 letter, plaintiff under the contract would lose any right he may have had to require application of the deposit receipt credits to his 1965 liability. In this respect the Government's attempt to accept purported to create legal relations different from those proposed by plaintiff.

█ Although the deposit receipts are not in evidence, it is clear from the record that they identified the Sheetrock return and were designated as applying against the liability shown thereon.[20] It is clear that a taxpayer who specifies the liability against which the payment he tenders should be applied has the right to insist that his instructions be respected. In *F. P. Baugh, Inc. v. Little Lake Lumber Co.,* 185 F.Supp. 628, 631 (N.D.Cal.1960), aff'd in part, rev'd in part, 297 F.2d 692 (9th Cir. 1961), cert. denied, 370 U.S. 909, 82 S.Ct. 1256, 8 L.Ed.2d 404 (1962), the Government conceded that a taxpayer has such a right. Such concession is consistent with the testimony of IRS officials here to the effect that under IRS policy, payments are applied to the period and liability designated by the taxpayer, or if this would create an overpayment, to some other liability of that taxpayer. Language in other cases, *see, e. g., Hewitt v. United States,* 377 F.2d 921, 925 (5th Cir. 1957), suggests that this policy is required by law. In *Baugh,* the court accepted the Government's concession, ap-

plying general contract principles, and the question was not appealed.

Plaintiff's failure, in his October 16 letter, to mention the depositary receipts, the 1965 liability, and the erroneous credits in his 1964 account, certainly did not as a matter of law amount to a proposal that he abandon his attempts to correct a misapplication which was contrary to IRS policy and impermissible in law. By specifying this as a legal consequence of the contract in its November 27 letter, the Government added a condition which would have caused a material and therefore vital variation in the proposal. This circumstance was by itself sufficient to prevent a contract from being formed.

### C. *Lack of Mutual Assent*

█ If a person wishes to enter into a bilateral contract with someone else, he informs the other person of this by offering to exchange a promise he is willing to make for another promise he would like the other person to make in return. A contract is formed if the offeree agrees to the exchange.

█ If the offeree's understanding of the offer, that is, of the promises offered and requested, coincides with the offeror's understanding, and his acceptance is unequivocal, there is a contract in accordance with the mutual understanding of its terms. However, complications ensue if the mean-

20. After the depositary receipts were located, but before the credits they represented were credited to plaintiff's account (an operation which under IRS procedure involved entering the information on punched cards, feeding the cards into the Service Center computer for conversion to computer tape, shipping the tape to the National Computer Center, and feeding it into the computers there), the correspondence unit in the Service Center addressed the letter of April 6, 1967, already mentioned, to plaintiff. After plaintiff responded, the credits were applied to the proper account (by use of the procedure just described). It is apparent from the letter of April 6 that the depositary receipts were before its author. Since at one time the depositary receipts were detached from the return, but on April 6, 1967, personnel in the correspondence unit either had located the return or were able from the receipts alone to determine plaintiff's tax liability for the fourth

quarter of 1965, it is apparent that the receipts either identified the return or specified the liability. Moreover, although the receipts are not in evidence, the check submitted with them and the Sheetrock return was introduced in evidence by plaintiff. In one corner it contains the legend "4th Qtr 941" and plaintiff's employer identification number. The inclusion of such information on the check is further convincing evidence that the depositary receipts also identified the appropriate period and liability.

Government personnel testified at trial that it is IRS practice to apply deposits evidenced by depositary receipts to the taxable period within which the receipts were purchased. As a practical matter, therefore, a taxpayer would be justified in failing to identify his return or the taxable period on the receipts. However, the record here establishes that plaintiff made such identification.

ing conveyed by either offeror or offeree fails to coincide with the meaning intended. To say that the minds of the parties must "meet" on every material or essential element of the proposed contract is misleading, for such is often not necessary. Nonetheless, because to form a contract the offeree must give the promise requested, the court, as a predicate for deciding whether a contract has been formed, often must place itself in the shoes of each party and determine the meaning each gave to the words which passed between them. *See generally* 3 Corbin §§ 538, 543A–B; 1 Williston § 95.

 The circumstances surrounding the settlement correspondence between White and the Government during late 1967 have already been fully developed. The negotiations of a settlement of the 1963 and 1964 assessments took into account, at least from the Government's standpoint, the credit of $8,159.42. It is apparent that until September or October of 1967 no one concerned with the refund suit or the 1963 and 1964 assessments knew the source of the credit. Plaintiff asserts that if he had known its true source, the offer to compromise contained in the August 18 letter never would

have been made, and that once the source was discovered, the offer was amended on October 16 to voice the offer in terms of a total figure of $4,200. The Government's letters of October 18 and November 27, as well as the position it has taken since, suggest a failure to apprehend that plaintiff intended by dispatching his October 16 letter to supersede his prior offers. And the record reflects that the Government's failure so to apprehend may not have been entirely unjustified.[21] Nor was White unjustified in assuming that the Government understood his October 16 letter as he did himself.[22]

 Viewing the correspondence between White and the Government as a whole and in light of the surrounding facts and circumstances, I find and conclude that the terms of the Government's acceptance varied in material respects from the terms of plaintiff's offer. It is clear from the record that plaintiff and the Government failed to assent to the same exchange of promises. For this reason also, the parties failed to enter into a binding contract of settlement.[23]

21. As previously noted, the offer of August 18, as amended August 26, was never expressly revoked. Moreover, plaintiff never responded to the October 18 letter from the Government, even though it contained the rather clear implication that the Government considered the August 18 offer merely amended, not superseded.

A private party with reason to know the meaning intended by an offeror may in appropriate circumstances find himself bound to a contract consistent with such meaning, even though his understanding of the offer at the time he accepts it differs from the meaning intended by the offeror. See generally 3 Corbin § 610, at 696. But courts often have held that conduct by Government officials which would certainly estop a private party from denying the existence of a contract does not bind the Government to a contract compromising a tax controversy unless the contract was expressly approved by the appropriate Government officials precisely in the manner required by statute, 26 U.S.C. § 7122. Probably the most extreme case of this kind is *United States v. Feinberg*, 372 F.2d 352 (3d Cir. 1965), aff'd on rehearing en banc, 372 F.2d 352, 359 (1967). In view of the prevalence of such decisions, but the apparent absence of a decision on facts similar to those presented here, this Court is

reluctant to decide whether acceptance of a taxpayer's offer by Government officials who negligently fail to appreciate the meaning intended by the taxpayer binds the Government to a contract consistent with such intended meaning. Because the alleged contract here is certainly deficient for other reasons, and plaintiff asks that it not be enforced as he construes it unless the Court finds it to exist, it is not necessary in this case to resolve that issue. It therefore will be left open.

22. The implication mentioned in the preceding note, rather clear to one in the Government's position, would likely be apparent only by hindsight to one in White's position. The body of the October 18 letter repeated with precision the terms of the offer "contained" in White's letter dated two days previously. Neither the credits nor any other specific term of the August 18 offer were mentioned. The implication arises by negative inference from the introductory sentence in the October 18 letter, a sentence which one in White's position would be justified in reading hurriedly.

23. This reason is separate from, although similar to, the principle of law that a contract should be avoided if the parties were mistaken as to a material fact of the agreement. *See*

## III. RELIEF

By virtue of the findings of fact and conclusions of law contained in this Memorandum Opinion, plaintiff is entitled to the following specific relief prayed for in his last amended complaint, namely:

(1) Refund of $15,612.89 together with interest thereon as provided by 26 U.S.C. § 6611 and 28 U.S.C. § 2411;

(2) Adjustment of the Government's records to reapply the sums remitted by plaintiff with respect to his tax liability for the fourth quarter of 1965 to the correct account, the effect of such adjustment being the creation of a zero balance as of early February 1966 in plaintiff's account for the fourth quarter of 1965; and

(3) Dismissal of the Government's counterclaim.

Plaintiff's final prayer in his last amended complaint, "For any and all other and further relief as may be equitable and appropriate in the premises," requires a careful consideration of the consequences to plaintiff and possible liability therefor, flowing from the manner in which the Government has attempted to collect the taxes originally claimed by it to be due.

The procedure by which the Government determined that plaintiff was liable for 1963 and 1964 payroll taxes, as well as the administrative review afforded him, is set forth in this Memorandum Opinion, supra, and the prior Memorandum and Order, 281 F.Supp. 252 (1968). The proposed taxes were assessed, and plaintiff invoked the aid of the judiciary. To review matters very briefly, examination of the income tax returns of many of the alleged employees revealed that many had paid income and self-employment tax. Much of the assessment against plaintiff was abated, and the parties stipulated that plaintiff's liability for 1963 and 1964 taxes could not exceed $25,629.48. Seeking to limit the amount in controversy still further, as well as to prepare his case for trial, plaintiff invoked the

discovery rules to obtain access to the returns the Government failed to furnish voluntarily. The Government did not object to his demand that the returns be furnished. On the other hand, it failed to comply, and plaintiff went to trial lacking reliable evidence.

While this suit was pending, plaintiff learned that the Government was asserting a deficiency for the fourth quarter of 1965. He immediately began attempts to get this mistake corrected. When Agent Heath of the Houston IRS office examined plaintiff's 1963, 1964 and 1965 records, he found that the credits for plaintiff's payments of 1965 payroll taxes had been misapplied to plaintiff's 1964 account. Heath promptly prepared and dispatched a request for correction to the Service Center at Austin, which should have cleared and closed plaintiff's 1965 account. However, before his request was accomplished, a representative of the Department of Justice contacted the Service Center and directed personnel there not to correct the accounts as requested by Agent Heath.

As a result of intentional conduct, known mistakes in the statement of plaintiff's tax liabilities for 1963, 1964 and 1965 remained uncorrected and consequently, the liens filed against plaintiff to secure such liabilities also remained uncorrected. The existence of these liens subjected plaintiff to severe economic compulsion. When filed, the liens approximated but did not exceed the amount then claimed by the Government to be due, some $89,000. In April 1967, however, a stipulation limited plaintiff's maximum liability to $25,629.48, and in June, the credits were transferred to the account for the first quarter of 1964, leaving unpaid a maximum of less than $18,000. Nevertheless, the liens remained at $89,000.

In September plaintiff was billed for $8,243.06, and a lien in that amount was filed. The next spring judgment on the refund suit became final, leaving in controversy either $12,443.06, as stated in the

---

generally, e. g., 3 Corbin §§ 597–621; Restatement §§ 500–11. A case resolving an equitable claim of this kind in a taxpayer's favor is *Loeb*

*v. United States,* 17 F.Supp. 966 (S.D.N.Y. 1936).

Government's letter of November 27, 1967, or $15,612.89, as the Government then interpreted its records. This notwithstanding, the liens remained as before, six or eight times the amount remaining in dispute. And the Government refused, until after plaintiff had paid the $15,612.89 in full, to abate any of this inflated total, in disregard of this Court's announced opinion that the liens based on the 1963 and 1964 assessments were null and void, 281 F.Supp. at 262–64, and the partial final judgment entered pursuant thereto.

The ultimate tactic adopted by the Government was to offer the motion for judgment which for the reasons heretofore set forth, lacked even the slimmest justification in law. In essence, the Government's claim of settlement is frivolous. Conduct of this sort by lawyers has been condemned in the strongest terms.[24] See, e. g., American Bar Ass'n Canons of Ethics, Canon 30; American Bar Ass'n Code of Professional Responsibility, EC 7–4 & DR 7–102 (Final Draft July 1, 1969).

■ The prayer for general relief in plaintiff's last amended complaint is thus not unsupported by the record. Plaintiff appears to have been grievously mistreated, but the question posed is not whether he has been wronged, but whether he has suffered compensable damages. Neither party has yet addressed itself specifically to this issue. The methods employed by the Government, or its representatives, under somewhat comparable facts have heretofore been criticized, *Seattle-First Nat. Bank v. United States*, 44 F.Supp. 603, 610 (E.D. Wash.1942). aff'd, 136 F.2d 676 (9th Cir. 1943), aff'd, 321 U.S. 583, 64 S.Ct. 713, 88 L.Ed. 944 (1944), but neither party has cited, and the Court has not found, any authority for or against assessing damages against the Government or its representatives for conduct like that which occurred here. Nor has either party offered evidence with reference to the damages, if

any, plaintiff has suffered as a consequence of wrongful conduct in connection with this suit.

In this posture of the pleadings and record, it would be unjust for this Court to take any action on plaintiff's prayer for general relief at this time. Plaintiff's position at trial, as well as in his last amended complaint, indicates that principally he is interested in obtaining refund of the moneys he never should have had to pay the Government. He is entitled to that immediately and may, if he wishes, submit a motion for judgment granting such relief, as permitted by Rule 54(b), Fed.R.Civ.P. His general prayer and the Government's response thereto, on the other hand present a question which cannot properly be resolved under the present pleadings or on the present record. Should either party wish to amend its pleadings in this regard, it may file an appropriate motion within 25 days, with opposition, if any, to be filed within 5 days thereafter. In acting on any such motion, this Court will be governed by Rule 15(a), Fed.R.Civ.P., and will grant leave to amend "freely . . . when justice so requires." And likewise, each party will be given the opportunity to submit additional evidence on the issues raised by such amended pleadings.

All facts set out in this Memorandum Opinion, to the extent that they may be relevant to the disposition of the issues presented by the Government's motion for judgment, are hereby found to be facts for the purposes of such disposition. Such finding, however, is not intended to be and is not a finding of any fact concerning any issue which may in the future be raised in a further amendment to the pleadings of the parties. Similarly, the foregoing constitutes conclusions of law with respect to the issues presented by the Government's motion for judgment, to the extent it may be relevant to their disposition.

---

**24.** It should be made clear that the Court does not question the professional integrity or good faith of trial counsel for the Government. It is apparent from the record that trial counsel was acting under explicit instructions from his superiors. As far as trial counsel is concerned, the record reveals at most that by failing to disobey the instructions from his superiors he may have committed an error in professional judgment.

Should plaintiff desire the Court to enter partial judgment on the issues disposed of herein, he may so move within 25 days, with opposition, if any, to be filed within 5 days thereafter. Attached to such motion should be a proposed judgment consistent with the views expressed in this Memorandum Opinion. In view of judicial notice having been taken by the Court of the automatic data processing procedures of the IRS, entry of judgment will be delayed 10 days after the expiration of said 30 days in order to afford each party the opportunity and additional time in which to point out any apparent misunderstanding or misstatement of such procedures by the Court.

The Clerk will file this Memorandum Opinion and send a copy to counsel for each party.

AMENDED MEMORANDUM OPINION:

In the memorandum opinion rendered in this case June 15, 1970, both parties were invited to comment on the Court's discussion of the computer system of the Internal Revenue Service (IRS). The Government has responded in a Memorandum from the Service's Acting Assistant Commissioner (Data Processing), which has been filed and denominated its Motion for Clarification. The motion reflects a careful and thoughtful consideration of the Court's description of the IRS automatic data processing system and of the system's handling of the tax returns filed by Plaintiff.

The Acting Assistant Commissioner's motion has prompted clarification of the Court's opinion describing the IRS automatic data processing system, as follows:

1. The first two sentences in the third paragraph on page 48 of the opinion are deleted, and the following substituted therefor:

"The assessment cause liabilities for payroll taxes to be recorded in the summer of 1966 in the records of the IRS, and thereby created deficiencies and apparent delinquencies in Plaintiff's accounts for all four quarters in and for each of the years 1963 and 1964. Such liabilities for 1963 were recorded in the Office in a manually prepared ledger account. The liabilities for 1964 were posted to the appropriate account in the IRS computer at the National Computer Center. All such apparently delinquent accounts were assigned to a revenue officer in the Houston office of the Delinquent Accounts and Returns Branch of the Collection Division of the Office of the District Director."

2. The first paragraph beginning on page 54 is deleted, and the following substituted therefor:

"The output tapes generated by the computer at the Service Center are shipped to the IRS National Computer Center near Washington, D.C. This facility contains the Service's computerized tax records for all taxpayers. Such records consist of two major divisions, the Business Master File and the Individual Master File. Within each Master File is an account for each taxpayer. The Entity Section of each account identifies the taxpayer and specifies the information and returns which such taxpayer is required to file. The remainder of the account is the Returns and Accounts Section, which contains the tax liability and accounting data for such taxpayer, and is subdivided into modules (herein called "master file modules"), one module being created and maintained for each tax period for each type of tax.

"The magnetic tapes which are received from the Service Center are fed into the computers at the National Computer Center to update the master file modules. The computers are programmed to analyze the information in the master files and detect "ostensibly improper deviations from the tax laws." [14] They generate output magnetic tapes indicating rights to refund, certain kinds of delinquencies, and returns with unusual characteristics. The refund tapes are forwarded to the Treasury Department, where they cause refund checks to be printed and

mailed. The other magnetic tapes are sent back to the Service Center, where they generate appropriate action by personnel there or in the office of the District Director."

3. The first paragraph beginning on page 55 of the opinion is deleted and the following substituted therefor:

"Only one other group of transactions attributable to the filing of the Drywall return is reflected in the printout. This was the assessment of a penalty and interest for late filing (the return was mailed one day late), and a subsequent payment of the penalty and interest."

Certain comments of the Acting Assistant Commissioner concerning the Court's discussion of the progress of the Sheetrock return through the IRS processing system require no modification of the opinion previously rendered. However, because they reflect a misunderstanding of the thrust of the opinion, this amended memorandum opinion will be extended to consider them.

As the Acting Assistant Commissioner recognizes, the purpose of the processing system is to process tax returns with all reasonable dispatch. Such official remarks quite properly that "The long delay from February 1966 to September 1967 to process the Sheetrock return is inexcusable and is certainly not an acceptable tolerance of the Internal Revenue Service's ADP system." The Commissioner contends, however, that the fault for the delay should be placed on imperfections in the Sheetrock return as well as the processing errors made by the automatic data processing system.

Three imperfections in the Sheetrock return are noted by the Acting Assistant Commissioner. First, the Commissioner asserts that "the filing of a second return, the Sheetrock return, was improper at best and possibly illegal at worst." Amplification of this remark was requested by the Court, and was furnished by an attorney for the Government in a subsequent letter supporting the charge of impropriety by citation of Section 31.6011(a)–7(a) of the Regulations,

duly promulgated under the authority of Section 6011 of the Internal Revenue Code:

"Only one return on any one prescribed form for a return period shall be filed by or for a taxpayer."

Two rulings by the IRS, Revenue Ruling 69–522, 1969 —— Cum.Bull. ——; and S.S.T. 182, 1937–2 Cum.Bull. 373, reflect that the Service has previously applied this requirement strictly in circumstances much like those of the instant case. In each of the cited rulings the conclusion was reached that a partnership should file only one 941 form even if it carried on two disparate businesses.

On the other hand, the charge of possible illegality cannot be substantiated on the facts of the instant case, and the attorney for the Government in the supplemental response admits as much. The Memorandum for the Acting Assistant Commissioner intimates, and the supplemental response by the Government attorney indicates more specifically that the Internal Revenue Service considers the filing of two returns for one tax period as prima facie a badge of fraud, and has designed its processing system to prevent processing of a second return until the possibility of fraud has been decisively negated.

Efforts by the Internal Revenue Service to detect fraud and tax evasion are to be commended. See, e. g., 26 U.S.C. §§ 6672, 7201, 7206–07. However, the record in the instant case does not suggest that processing of the Sheetrock return was delayed to permit investigation for fraud. Processing was indeed delayed, and for a period which the Government now concedes was "inexcusable", but the record establishes that the Internal Revenue Service failed to take any action whatsoever to substantiate or refute the possibility of fraud. In effect, as it was applied to the Sheetrock return, the IRS processing system was designed merely to prevent the input of a second return; it was not designed to permit the IRS to uncover fraud by preventing such input.

The second and third imperfections in the Sheetrock return which are noted by the Acting Assistant Commissioner are the ar-

ithmetical error mentioned in the opinion on page 52 and the claimed overpayment · credit mentioned in the opinion on pages 52–54. The Commissioner remarks that the processing system is designed to detect all mathematical errors to permit a review and correction of them, and that any claim for credit like that on the Sheetrock return would require verification, probably by the Social Security Administration, which maintains the records of wages.

But the precise nature of the errors, if any, committed by Plaintiff is not material. What is material is the assertion by the Acting Assistant Commissioner that the existence of these errors, each of them undoubtedly common to millions of tax returns filed each year, justifies a substantial delay in the processing of the Sheetrock return. If the officials in charge of the IRS computer system in fact consider this assertion to be valid, their point of view goes far to explain the inordinate delay in processing to which the Sheetrock return was subjected.

■ The purpose of the computer processing system is not only to process perfect returns with dispatch, it is also to process and correct imperfect returns with dispatch. The Court recognizes that an imperfect or an eccentric return will require more time for processing, and does not criticize the IRS computer system, or the officials in charge of such system, for attempting to correct mistakes and examine unusual features. On the other hand, in its original opinion the Court did criticize the IRS system and its supervisors for the absence of procedures permitting errors and eccentricities to be detected and corrected promptly. Such remains the opinion of this Court. That a return is imperfect is no justification for any appreciable delay in processing it. Until the officials in charge of the IRS processing system accept this truth, other taxpayers will be oppressed by that system just as the record reveals Plaintiff was oppressed.

DONE and entered nunc pro tunc June 15, 1970, this 11 day of December, 1970.